# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF MISSISSIPPI
# OXFORD DIVISION

| | |
|---|---|
| TOTAL TRANSPORTATION OF MISSISSIPPI, LLC, ) ) ) | |
| Plaintiff, ) ) | Civil Action No. 3:17-CV-240-MPM-RP |
| vs. ) ) | |
| JASON WILLIAMS, ) ) | |
| Defendant. ) | |

## VERIFIED COMPLAINT FOR INJUNCTIVE & MONETARY RELIEF

Plaintiff, Total Transportation of Mississippi, LLC ("Total Transportation") submits the following causes of action and claims for relief against Defendant Jason Williams.

### PARTIES

1. Total Transportation is a transportation and logistics company organized under the laws of Mississippi, with its principal place of business in Mississippi.

2. Defendant, Jason Williams ("Williams"), is a citizen of Mississippi and may be served with process at 3362 Valley Crest Drive, Southaven, Mississippi 38762. Williams previously worked for Total Transportation.

### JURISDICTION & VENUE

3. This Court has subject matter jurisdiction pursuant to Title 28, United States Code, Section 1331 because Total Transportation asserts claims under federal law, specifically the Defend Trade Secrets Act (18 U.S.C. §§ 1836, et seq.) and the Computer Fraud and Abuse Act (18 U.S.C. §§ 1030, et seq.).

4. This Court has supplemental or pendant jurisdiction over Total Transportation's remaining claims pursuant to Title 28, United States Code, Section 1367 because said claims are so related to Total Transportation's federal law claims that they form part of the same case or controversy under Article III of the United States Constitution.

5. This Court has personal jurisdiction over Williams because, as a Mississippi resident, this Court has general personal jurisdiction over him.

6. This is the proper venue for this action because a substantial part of the events giving rise to this action occurred in this District and Division. *See* 28 U.S.C. § 1391(b).

### THE NATURE OF TOTAL TRANSPORTATION'S BUSINESS

7. Total Transportation offers strategic freight transportation services including asset-based trucking services; logistics and brokerage services; expedited services; and extended services.

8. Total Transportation offers its transportation and logistics services across the entire United States, and also offers shipping to parts of Mexico and Canada.

9. Total Transportation's customers include large national corporations as well as smaller companies. It provides transportation of goods for its customers to and from locations across the United States, as well as through certain locations in Mexico and Canada.

10. Total Transportation's business includes logistics/brokerage operations provided through its Total Transportation Logistics Division.

11. Total Transportation's Logistics Division acts as a broker between a customer and an available carrier. For its logistics services, Total Transportation finds an available carrier to provide transportation services regarding particular transportation needs of a customer. Total Transportation ships around 20,000 shipments yearly through its Logistics Division.

12. In its role providing logistics/brokerage services, the value that Total Transportation can provide to its customers is key market/industry information and connections to a vast network of carriers to provide the best service and most competitive pricing for moving freight from Point A to Point B. Thus, the essential function of the Logistics Division at Total Transportation is to provide a service of supplying customers with information critical to having their transportation needs met and connecting them with the right carrier.

13. Total Transportation can maintain a competitive advantage by having strong personal relationships with key employees of transportation carriers. Such relationships are essential to Total Transportation maintaining a competitive edge in a highly competitive business. Total Transportation has employees working as "Logistics Agents" who develop contacts at key carriers who can supply the services that Total Transportation's customers need. These Logistics Agents maintain relationships with key personnel to obtain highly competitive pricing for shipping freight by continuing to supply the carriers with a steady supply of freight to ship. Logistics Agents have access to critical information for serving Total Transportation's customers' needs, such as which carriers can provide shipping on different "lanes," which are essentially routes from one city to another city and what each carrier's most competitive rate is. Logistics Agents with strong relationships with key individuals at carriers can negotiate highly competitive rates for shipping by using their continuing personal contact with the carrier for ongoing mutually beneficial business. A true and correct copy of the job description for a Logistics Agent is attached to the Verified Complaint as **Exhibit 1**.

14. The methods, processes, and strategies Total Transportation uses to determine an appropriate carrier, and its logistics/brokerage strategies for each customer take significant effort to develop and are highly confidential and proprietary. Total Transportation uses technical and nontechnical data, financial information, and customer requirements to develop formulas,

processes, plans, methods and compilations of information to create highly customized bids and other pricing for each of its customers based on the services its transportation carriers can provide. Employees working on the carrier side of a logistics/brokerage process provide crucial information to employees working closely with customers, so that those employees can make a competitive bid for the customer's shipping needs. Such pricing of services is based on information that is highly confidential, including carrier rates, carrier lanes and capacity, labor rates, burden (overhead) rates, fuel and maintenance costs, unique customer characteristics, market conditions, historical data, each customer's particularized needs and routes, prior carrier history, and profit margin.

15. The processes and formulas Total Transportation uses derive independent economic value by not being generally known to, and not being readily ascertainable by proper means by other persons who may obtain economic value for its disclosure and use.

16. Further, because Total Transportation works with large national corporations or multi-national corporations employing thousands of employees, particular contact information for its carriers' key employees is confidential and not readily ascertainable in the industry as a whole.

17. Information regarding which employees for large national carriers can fulfill the shipping needs for particular lanes is not publicly available. Such information is acquired only through compiling such information through extensive experience working with such national carriers.

18. The success of Total Transportation's logistics/brokerage business is highly dependent on its ability to fulfill customers' needs through connecting the customer with a carrier that can provide the shipping needed, in the manner required, in the quantity needed, by the necessary timeframe, at a rate the customer is willing to pay. All such information

constitutes a valuable, special, and unique asset of its business. This business interest is not shared with or regularly acquired by competitors and represents a substantial investment of time, money, and effort by Total Transportation.

19. Over the many years that Total Transportation's Logistics Division has been servicing its customers and developing relationships with industry carriers, it has gained valuable information and insights as to the needs of its customers and how various carriers can fulfill the needs of those customers.

20. In addition, Total Transportation takes steps to maintain the confidentiality of such information. Many employees, such as Williams, sign noncompete and/or nondisclosure and nonsolicitation agreements with the company, as well as confidentiality agreements. *See* **Exhibits 2 and 3**.

21. Total Transportation also maintains a policy protecting the confidentiality of its customer and pricing information. *See* **Exhibit 4**. Its Protection of Confidential and Proprietary Information policy states, "Total Transportation's confidential and proprietary information is vital to the current operations and future success of the Company. Each employee shall use reasonable care to protect or otherwise prevent the unauthorized disclosure of such information. In no event shall confidential information be disclosed or revealed within or outside Total Transportation without proper authorization or purpose. If an employee is uncertain whether certain information should be treated as confidential, the employee should presume that such information is confidential and not disclose it without proper authorization." *Id*. The policy also defines the term "Confidential Information" as "a piece of information, or a compilation of information, in any form (on paper, in an electronic file, or otherwise), related to the Company's business that the Company has not made public or authorized to be made public, and that is not generally known to the public through proper means." *Id.* The definition includes Total

Transportation's "business methods, business plans, trucking lanes, databases, systems, technology, intellectual property, know-how, marketing plans, business development, operations, products, services, research, development, inventions, financial statements, financial projections, financing methods, costs, prices, pricing strategies, customer information . . . customer lists, and methods of competing."

22. Total Transportation also maintains a Computer and Systems Security Policy that states in part, "All computers and electronic devices and the data stored on them are and remain at all times the property of Total Transportation. As such, all messages created, sent, or retrieved over the Internet, the Company's electronic mail systems, or on any Company issued electronic device are the property of the Company, and should be considered Company information." *See* **Exhibit 4.**

23. Total Transportation further protects its confidential information by having each employee have a user name and password to obtain access to the Total Transportation computer system. It also maintains policies relating to the security of its physical property. *See* **Exhibit 4**.

24. The success of Total Transportation's business is highly dependent on hiring, training, developing, and retaining qualified individuals as Logistics Agents. Such individuals are critical for Total Transportation to generate new strategies to fulfill customer needs, to sustain and maintain relationships with existing carriers, and to promote the overall goodwill of Total Transportation's business.

25. When Total Transportation hires a new employee in the Logistics Agent position, it provides the new employee with on-the-job training that lasts from about two weeks to as long as a month, depending on the employee's background in the transportation industry and familiarity with Total Transportation's computer system and processes. Employees receive training regarding the industry as a whole and core competencies the employee will need.

However, new employees also receive significant training regarding Total Transportation's strategies for staying competitive, what the Logistics Division does, and how a Logistics Agent fits into Total Transportation's overall business model, including how not to create a conflict with the asset-based side of Total Transportation's business.

26. Throughout their employment, Total Transportation's managers provide ongoing training and mentoring to Logistics Agents regarding strategies to increase volume, efficiencies, loads and profitability. Managers provide regular guidance on: troubleshooting problems; increasing efficiencies; leads on carrier contacts; job coaching; and strategic thinking to enhance Total Transportation's operations.

27. Given the nature of the work performed by Total Transportation's Logistics Agents, they spend a significant amount of time communicating with particular contacts of each carrier and developing longstanding and critical relationships with carrier contacts, such that they often become the face and voice of Total Transportation to the carriers. Thus, Logistics Agents develop personal goodwill through and directly as the result of the efforts, expertise, financial investment, and goodwill of Total Transportation.

**THE EMPLOYMENT RELATIONSHIP AND EMPLOYEE CONFIDENTIALITY AND NONCOMPETE AGREEMENT BETWEEN TOTAL TRANSPORTATION AND DEFENDANT WILLIAMS**

28. Total Transportation hired Williams on December 9, 2013, to work as a Logistics Agent working in Total Transportation's Logistics Division in its Olive Branch, Mississippi office. In this position Williams earned $36,300 in annual salary plus 2% commission on all load margins. *See* **Exhibit 5**.

29. In his position as a Logistics Agent, Williams worked with particular Total Transportation carriers and had access to unique carrier contact information stored on a computer hard drive accessible only to Total Transportation employees with a need to know such

information. In such capacity, Williams developed a working knowledge of confidential and proprietary carrier capabilities, available lanes, shipping rates, carrier contacts, and load capacity information.

30. On December 4, 2013, before he started his employment at Total Transportation and as an express condition of such employment, Williams signed a "Total Transportation of Mississippi, LLC Employee Confidentiality and Non-compete Agreement" (the "Agreement"). A true and correct copy of the Agreement is attached as **Exhibit 2**.

31. The Agreement defines "Confidential Information" as:

> information of a special and unique nature and value that is not generally known to the public, including but not limited to, Total's non-public business records, financial information, customer information, computer programs and codes, lists of driver and employee names, pricing information, cost information, budget information, business strategy, supplier information, lists of actual and potential customers and vendors, vendor pricing, customer pricing and marketing information. Employee acknowledges that TOTAL has invested substantial time and resources developing and maintaining its Confidential Information, and that it is a valuable asset to Total and that Total relies on its Confidential Information to conduct its business.

*See* **Exhibit 2, ¶ 1.**

32. The Agreement provides that Williams agrees that Confidential Information defined in the Agreement constitutes a trade secret of Total Transportation. *See* **Exhibit 2, ¶ 2.** Williams also agreed not to remove any Confidential Information from Total Transportation's premises and to return all Confidential Information to Total Transportation. *Id.* **at ¶¶ 2, 4.**

33. The Agreement also provides:

> Employee further agrees that during the period that Employee is working at TOTAL and during the period of one (1) year following termination of employment with TOTAL, for whatever reason, Employee shall not directly or indirectly work at or have any financial interest in or be in any way connected or affiliated with, or render advice or services to, any business similar to that of TOTAL or that of a freight broker. During this period, Employee also agrees not to directly or indirectly divert, take away or solicit any customer or carrier of TOTAL. Employee specifically acknowledges and agrees that this short term of one (1) year will not preclude Employee from being gainfully employed and

that if Employee was no longer working at TOTAL, for whatever reason, and wanted to work in the same industry for a competitor of TOTAL that these specific restrictions are reasonable to protect TOTAL, the business and the other employees of TOTAL.

**Exhibit 2, ¶ 6.**

34. The Agreement further contains a non-solicitation clause providing that for a year following Williams' termination, "Employee will not solicit, on his/her behalf or on the behalf of any other person or entity, any employee or independent contractor performing services for Total." **Exhibit 2, ¶ 5**.

35. Williams also agreed:

that a violation of this Agreement would cause immediate and irreparable harm, loss and damage to TOTAL and therefore Employee specifically agrees that any actual or threatened violation of this Agreement may be immediately restrained or enjoined by a court of competent jurisdiction without limiting other recourse such as the recovery of damages. Total shall be entitled to seek such relief without the necessity of posting a bond or showing actual damages.

**Exhibit 2, ¶ 7.**

36. The Agreement also provides that Williams agrees to reimburse Total Transportation for the costs of enforcing the Agreement, including attorneys' fees. **Exhibit 2, ¶ 8**.

37. On December 4, 2013 Williams also signed a "Confidentiality Agreement". *See* **Exhibit 3.** The Confidentiality Agreement states in part:

Each employee is required to maintain the confidentiality of Company Trade Secrets. Employees shall not disclose Trade Secrets which include information regarding Company systems, processes, know-how, procedures, business strategies, pricing, customer data and technologies. Allowing unauthorized access to Trade Secrets and confidential information is strictly prohibited.

Each employee is required to keep confidential, and not to disclose or use, the confidential information belonging to the company pursuant to a confidentiality agreement, or received by the company in circumstances where it is clear that the information is proprietary and confidential. . . .

>All information of Total Transportation of MS, LLC is confidential unless specifically designed for distribution (i.e. sales brochures). Discussing information, reproducing material for non-Total Transportation of MS, LLC use of allowing unauthorized access to information is strictly prohibited. This includes making copies of confidential information (e.g., taking pictures with cell phones).

**Exhibit 3**.

38. Through his role as a Logistics Agent, Williams had access to Total Transportation's carrier contact information, including without limitation names of carriers who could serve specific crucial shipping lanes, as well as names of key employees within carrier organizations. He further helped maintain the relationships with many of those carriers. Williams' ongoing relationships with key carriers helped Total Transportation obtain the best terms and rates for crucial shipping routes for Total Transportation's customers. Williams also had access to key information relating to the best rates that could be negotiated with carriers.

39. Total Transportation provided all of the training and support to Williams to teach him how to do all of the requirements of his job. Such training was valuable and represented a significant expenditure of resources on the part of Total Transportation.

## WILLIAMS' RESIGNATION FROM TOTAL TRANSPORTATION

40. Williams voluntarily resigned from his position at Total Transportation on or about November 9, 2017. His last day working at the company was on November 9, 2017.

41. Upon information and belief, Williams became employed by HYC on or about November 27, 2017.

42. HYC maintains its principal office in Memphis, Tennessee and directly competes with Total Transportation in the areas of logistics and brokerage services. HYC provides logistics brokerage services for customers of transportation services by connecting them with the right carrier for the type of shipment needed. They offer to provide "Warehousing and Distribution Services strategically located near major Port Cities and Airport Hub Cities

throughout the U.S. in order to provide 'nationwide coverage' and the flexibility to our clients. . . . HYC Logistics maintains contracts and access to a wide range of both LTL and FTL Carriers enabling HYC to offer both 'expedited' and 'deferred' services at highly competitive rates." *See* www.hyclogistics.com and www.hyclogistics.com/wp-content/uploads/2017/06/2017-May-HYC-Presentation.pdf, attached to the Verified Complaint as **Exhibit 6**. Thus, HYC competes with Total Transportation on a nationwide level.

43. By letter dated November 9, 2017, and sent via overnight mail, the Associate General Counsel for Total Transportation's parent company, U.S. Xpress, Inc., notified Williams and HYC that Total Transportation had reason to believe Williams was going to be working for HYC. The letter reminded Williams of his obligations under the Agreement, including the noncompetition provision and the prohibition of his use of confidential information of Total Transportation. A copy of the November 9th letter is attached as **Exhibit 7**.

### WILLIAMS' MISAPPROPRIATION OF TRADE SECRETS AND CONFIDENTIAL INFORMATION

44. Immediately prior to his resignation, on November 10, 2017, Williams sent an email attaching a highly confidential document to a personal hotmail account listed as jasonsid@hotmail.com. A copy of the email showing an attached Excel spreadsheet is attached to this Verified Complaint as **Exhibit 8**.

45. Total Transportation discovered that Williams sent this email after Williams' employment with Total Transportation ended.

46. The document Williams sent to the jasonsid@hotmail.com included highly confidential and proprietary trade secret information belonging to Total Transportation. The spreadsheet contains a listing of every truck load Williams brokered in 2017. It contains information about every customer lane, freight lane, customer rate, carrier code or name, and the

carrier rate. The spreadsheet contains detailed information about 2,493 loads around the country that Williams brokered between January 1, 2017 and November 8, 2017.

47. The spreadsheet is a document created by Williams as part of his job duties as a Logistics Agent. He completed this information daily for use by Total Transportation and sent it to his supervisor. Total Transportation then verified the load information and created a "master" spreadsheet that included load information for each Logistics Agent in the company. The information contained in the spreadsheet was information about Total Transportation's confidential customer rates, carrier rates, lanes, and customer names. Such information could provide a competitor with instant access to carrier pricing, customer pricing, access to specific critical lanes, and types of loads brokered. Sharing this information would allow a competitor instantly to compete with Total Transportation for specific customers on specific lanes by underbidding Total Transportation.

48. Initially, Total Transportation has only been able to access Williams' Total Transportation email account for the four days prior to his date of termination from Total Transportation due to the length of time Total Transportation retains emails on its servers without the assistance of its Information Technology staff. Thus, Total Transportation is unaware of whether Williams' emailed any other Confidential Information to a personal email account prior to his termination from Total Transportation. Total Transportation is continuing to investigate Williams' Total Transportation email account activities.

49. Although U.S. Xpress's counsel and Total Transportation's counsel have received responses from HYC Logistics to the letter dated November 9, 2017, the parties have been unable to resolve the issues that are the subject of this Verified Complaint. HYC did not deny that it hired Williams as its employee. Total Transportation is filing its lawsuit to protect its

interest its confidential and proprietary information and to enforce the terms of Williams' Agreement.

**FIRST CAUSE OF ACTION: DEFEND TRADE SECRETS ACT**

50. Total Transportation incorporates and re-alleges all preceding paragraphs.

51. The Confidential Information is related to Total Transportation's goods and services; goods and services that Total Transportation offers and provides in interstate commerce.

52. The Confidential Information is not commonly known by or available to the public; it derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and it is the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

53. The Confidential Information, in whole or in part, qualifies as a "trade secret" under the Defendant Trades Secret Act, Section 1839(3), 18 U.S.C. § 1839(3).

54. While employed by Total Transportation, Defendant Williams obtained access to Confidential Information, as defined in the Agreement, the Confidentiality Agreement, and Total Transportation's policies.

55. Williams knew or had reason to know that he came into possession of the Confidential Information under circumstances giving rise to a duty to maintain secrecy and/or limit use.

56. Williams has misappropriated the Confidential Information in violation of the Defend Trade Secrets Act.

57. Williams' wrongful conduct was willful, wanton, malicious, and/or done with reckless disregard to Total Transportation's rights. Williams ignored the terms of the

Agreement, the Confidentiality Agreement, and Total Transportation's policies relating to confidential and proprietary information and computer usage. Immediately prior to his resignation, Williams forwarded himself critical confidential information allowing himself to provide HYC with access to an immediate means of competing with Total Transportation' Logistics Division.

58. As a result of Williams' wrongful conduct, Total Transportation has been damaged in an amount to be proven at trial. Total Transportation has also suffered and will continue to suffer irreparable harm that is not compensable by money damages and may only be remedied by injunctive relief.

59. Additionally, given Williams' wrongful conduct was willful, wanton, malicious, and/or done with reckless disregard to Total Transportation's rights, Total Transportation is further entitled to an award of exemplary damages and attorneys' fees.

### SECOND CAUSE OF ACTION: MISSISSIPPI UNIFORM TRADE SECRETS ACT

60. Total Transportation incorporates and re-alleges all preceding paragraphs.

61. The Confidential Information, in whole or in part, qualifies as a "trade secret" under Mississippi Uniform Trade Secrets Act, Section 75-26-3(d) ("MUTSA"), Miss. Code Ann. § 75-26-3(d).

62. While employed by Total Transportation, Williams obtained access to the Confidential Information.

63. Williams knew or had reason to know that he came into possession of the Confidential Information under circumstances giving rise to a duty to maintain secrecy and/or limit use.

64. Williams has misappropriated the Confidential Information in violation of the MUTSA.

65. Williams' wrongful conduct was willful, wanton, malicious, and/or done with reckless disregard to Total Transportation's rights. Williams ignored the terms of the Agreement, the Confidentiality Agreement, and Total Transportation's policies relating to confidential and proprietary information and computer usage. Immediately prior to his resignation, Williams forwarded himself critical confidential information allowing himself to provide HYC with access to an immediate means of competing with Total Transportation. As a result of Williams' wrongful conduct, Total Transportation has been damaged in an amount to be proven at trial. Total Transportation has also suffered and will continue to suffer irreparable harm that is not compensable by money damages and may only be remedied by injunctive relief.

66. Additionally, given Williams' wrongful conduct was willful, wanton, malicious, and/or done with reckless disregard to Total Transportation's rights, Total Transportation is further entitled to an award of exemplary damages and attorneys' fees.

### THIRD CAUSE OF ACTION: COMPUTER FRAUD & ABUSE ACT

67. Total Transportation incorporates and re-alleges all preceding paragraphs.

68. Williams violated Section 1030 of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 by intentionally accessing Total Transportation's computer system(s) and/or e-mail account(s) without authorization, and/or in accessing said system(s) and account(s), he exceeded authorizations provided to him by Total Transportation, as described in its policies relating to confidential and proprietary information and computer usage.

69. Williams obtained access and/or exceeded access through the use of electronic device(s) and/or network(s) engaged in and/or affecting interstate commerce.

70. Williams' violations have proximately caused damage to Total Transportation in compensatory and punitive amounts to be determined at trial.

71. At a minimum, however, Total Transportation has incurred and will continue to incur not less than $5,000 in damages related to Total Transportation's efforts to investigate, assess, restore, and/or remedy the data and information unlawfully accessed by Williams, for example, by retaining undersigned counsel to prosecute this action and identify (through discovery and other investigation) additional data accessed, altered, and/or deleted by Williams as well as the significance of same.

### FOURTH CAUSE OF ACTION: BREACH OF CONTRACT

72. Total Transportation incorporates and re-alleges all preceding paragraphs.

73. The Agreement and the Confidentiality Agreement between Total Transportation and Williams constitute lawful and binding contracts.

74. Williams has breached and continues to be in breach of the Agreement and the Confidentiality Agreement.

75. As a result of Williams' wrongful conduct, Total Transportation has been damaged in an amount to be proven at trial. Total Transportation has also suffered and will continue to suffer irreparable harm that is not compensable by money damages and may only be remedied by injunctive relief.

### FIFTH CAUSE OF ACTION: CONVERSION

76. Total Transportation incorporates and re-alleges all preceding paragraphs.

77. Williams continues to be in possession of documents and information stolen (or retained without permission) from Total Transportation.

78. As Williams has no right or lawful claim to the documents and information, his possession of the documents and information is tortious.

79. As a result of Williams' wrongful conduct, Total Transportation has been damaged in an amount to be proven at trial. Total Transportation has also suffered and will

continue to suffer irreparable harm that is not compensable by money damages and may only be remedied by injunctive relief.

### JURY DEMAND

80. Total Transportation demands a trial by jury on all claims to which it is otherwise entitled to trial by jury.

### PRAYER FOR RELIEF

Based on the foregoing, Total Transportation respectfully requests the following relief:

i. temporary, preliminary, and permanent injunctive relief to the fullest extent allowed by law;

ii. all actual, compensatory, consequential, special, statutory, and/or punitive damages resulting from Williams' breaches;

iii. all actual, compensatory, consequential, special, statutory, and/or punitive damages resulting from Williams' other tortious or unlawful conduct;

iv. awarding all costs, expenses, and reasonable attorney fees incurred by Total Transportation in investigating, readying, bringing, and prosecuting this action; and

v. awarding any additional relief the Court deems warranted under the circumstances.

This, the 29th day of November, 2017.

Respectfully Submitted,

**TOTAL TRANSPORTATION OF MISSISSIPPI, LLC**

By Its Attorneys,

BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC

By: *s/ Zachary B. Busey*
ZACHARY B. BUSEY

**OF COUNSEL:**

Zachary B. Busey (Miss. Bar No. 103793)
BAKER, DONELSON, BEARMAN,
  CALDWELL & BERKOWITZ, PC
First Tennessee Building
165 Madison Avenue, Suite 2000
Memphis, Tennessee 38103
Telephone:    (901) 577-8164
Facsimile:    (901) 531-8494
Email:  zbusey@bakerdonelson.com

J. Lane Crowder (Tenn. Bar No. 027826)
(application for pro hac vice forthcoming)
BAKER, DONELSON, BEARMAN,
  CALDWELL & BERKOWITZ, PC
633 Chestnut Street, Suite 1900
Chattanooga, Tennessee 37450-1800
Telephone:    (423) 209-4152
Facsimile:    (423) 752-9594
Email:  lcrowder@bakerdonelson.com

## DECLARATION OF EDWARD MCGEHEE NELSON

The Declarant, Edward McGehee Nelson, pursuant to Tile 28, United States Code, Section 1746, declares under penalty of perjury that the following is true and correct:

1. I am over the age of 18, and I am competent to testify to the matters set forth herein.

2. I am employed by Total Transportation of Mississippi, LLC ("Total Transportation") as its Director of Logistics, and I am an authorized representative of Total Transportation.

3. The facts stated herein are based on my personal knowledge and a review of Total Transportation's business records.

4. I have read the foregoing Verified Complaint. Its contents are true and correct to the best of my knowledge, information, and belief.

So declared on this, the 29th day of November, 2017.

_____
Edward McGehee Nelson